Filed 12/2/22  Harouche v. The Wilshire Corp. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| MICHEL HAROUCHE, | B313745 c/w B315865 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SC124859) |
| v. | |
| THE WILSHIRE CORPORATION, et. al, | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elaine W. Mandel, Judge.  Affirmed.

James S. Link, Kelly F. Ryan, Jillian M. Reyes, and the Ryan Law Firm for Defendants and Appellants.

Stephen S. Smith for Plaintiff and Respondent.

_____

# *INTRODUCTION*

This is the second appeal arising out of a contract to build Plaintiff Michel Harouche's Malibu home. In 2008, Harouche hired defendant Stephen Sisca and Sisca's company, defendant The Wilshire Corporation (TWC), to oversee and manage the construction of Harouche's multi-million-dollar residence. Sisca surreptitiously conditioned the award of the construction contract on kickbacks from the general contractor, John Finton and his company, Finton Construction, Inc. (FCI).[1] Midway through the construction, Sisca and FCI fraudulently increased the cost of change orders for the project and split the profit from the marked-up amounts. Harouche sued FCI and Sisca. Harouche settled with FCI, disposing of Harouche's claims against FCI and FCI's cross-complaint against Harouche for an allegedly unpaid $608,000 for construction services and costs.

In the first appeal (*Harouche I,* appellate case No. B297364, 2020 WL 6736044) we reduced the judgment against Sisca to $802,993.72, and remanded for the trial court to determine under Code of Civil Procedure, section 877 whether the damages should be offset by the alleged $608,000 value of FCI's cross-complaint.[2] On remand, the trial court found that Sisca failed to prove the value of the cross-complaint, and declined to offset the award. On appeal, Sisca argues no substantial evidence supports the trial court's denial of the offset. We affirm.

---

[1] Unless the context indicates otherwise, we subsequently refer to Sisca and TWC collectively as Sisca, and Finton and FCI as FCI.

[2] All subsequent statutory references are to the Code of Civil Procedure unless indicated otherwise.

### FACTUAL AND PROCEDURAL BACKGROUND

We do not rehash the details of the fraud explained in our unpublished opinion in *Harouche I*. Suffice it to say, Sisca leveraged his position as Harouche's representative and conspired with FCI to obtain financial kickbacks at Harouche's expense. For purposes of this appeal, we discuss FCI's cross-complaint, the damages awarded to Harouche, and Sisca's motion to offset the damages award. Much of subsections 1 and 2 are taken from the Facts and Procedural Background section in *Harouche I*.

### 1.    *FCI's Cross-Complaint*

After Harouche sued FCI and Sisca, FCI filed a cross-complaint against Harouche, claiming Harouche had failed to pay "payment application #57," another outstanding balance, and an insurance deductible. FCI sought damages of $608,000.[3] While the case was pending, FCI filed for bankruptcy. Apparently with the bankruptcy trustee's approval, Harouche and FCI reached a settlement, where FCI stipulated to a $1,100,000 judgment in favor of Harouche. FCI agreed to dismiss its cross-complaint for $608,000, and to admit to facts demonstrating that the $1.1 million judgment against FCI was non-dischargeable under sections 523(a)(2)(A) and (a)(6), title 11 of the United States Code. Because FCI was still in bankruptcy, Harouche agreed to forbear from collecting the judgment all at once, and in return,

---

[3]    Sisca also filed a cross-complaint against Harouche. Sisca asserted claims for breach of contract and "common count," claiming Harouche owed Sisca $104,000 under the project management agreement. Following the bench trial, the court found against Sisca on its cross-complaint. The trial court's ruling is not before us on appeal.

3

FCI made small monthly payments to Harouche, commencing upon approval of its bankruptcy plan of reorganization. Only at the end of the plan period would FCI be obligated to pay the balance of the judgment.

In January 2017, Harouche and FCI filed an application with the trial court to determine that their settlement was entered into in good faith. Sisca contested the motion for the good faith settlement. Harouche filed an opposition, explaining why the settlement was reasonable. On May 25, 2017, the trial court approved the good faith settlement and entered "Judgment Pursuant to Settlement" against FCI. We have summarized the good faith settlement proceedings because of their connection to Sisca's offset argument in the present appeal.

## 2.     *Trial, Judgment, and Appeal in* Harouche I

Some eight months later, in January 2018, the bench trial in *Harouche I* took place. Because of the good faith settlement, only Harouche's claims against Sisca were tried. On June 12, 2018, the court issued its proposed statement of decision, finding in favor of Harouche and against Sisca. The parties then filed objections to the proposed decision. Sisca argued the trial court should have offset the damages awarded to Harouche by $608,000 – the value of FCI's cross-complaint against Harouche that had been released by the good faith settlement.

On August 14, 2018, the trial court issued its final statement of decision in *Harouche I*. The trial court found that Sisca had committed fraud and breached fiduciary duties to Harouche. Sisca renewed its objections regarding the lack of an offset based on the settlement between FCI and Harouche.

The March 2019 judgment awarded Harouche $1,962,837.72 in damages against Sisca, plus prejudgment

4

interest of $990,486.45.[4]  The court reserved "jurisdiction to calculate and award offset credits to [Sisca] for any future settlement payments that are made to Harouche by [FCI]."

In the first appeal, we found errors in the calculation of the fraudulent change order damages and modified the judgment against Sisca to $802,993.72.  We also remanded the case for the trial court to recalculate prejudgment interest and rule on Sisca's motion to offset the judgment by $608,000 (the amount of FCI's settled cross-complaint).

### 3.  *Remand*

Following remand, Sisca moved for a $608,000 offset (the entire amount alleged in FCI's cross-complaint).  Pursuant to section 877, subdivision (a), Sisca argued FCI's dismissal of its cross-complaint constituted payment of consideration to Harouche equal to the $608,000 in damages alleged in the cross-complaint.  Sisca relied on the FCI settlement dismissing the cross-complaint for $608,000, and on testimony from Harouche that he had not paid pay application #57 (which was part of the $608,000).

Harouche opposed the offset motion on several grounds.  First, Sisca had failed to sustain its burden to show that the release of FCI's cross-complaint was worth $608,000.  Second, Harouche did not owe the amounts alleged in FCI's cross-complaint because he had never approved the underlying work

---

[4]    After the trial court issued the final statement of decision, but before judgment was entered against Sisca, FCI paid Harouche $18,000 under the bankruptcy plan of reorganization.  On March 5, 2019, Harouche filed notice of the payment and requested an offset of $18,000 to the judgment.  On March 19, 2019, the court signed a revised judgment, decreasing damages by $18,000.

associated with the final payment application.  Third, FCI could not have enforced the construction contract with Harouche due to FCI's material breach of it.  In sum, Harouche asserted the cross-complaint lacked merit, and thus, FCI's dismissal of it was not consideration paid to Harouche.

In reply, Sisca asserted "Harouche made a judicial admission in his opposition to the Sisca Defendants' Motion to Contest the Good Faith Settlement that the negotiated settlement of $1,100,000 included a resolution of FCI' s cross-complaint which included the full amount of damages requested - $608,000."  Harouche's opposition to Sisca's motion to contest the settlement stated:  "FCI had a cross-complaint against Harouche for $608,000.  So, for example, if the Finton Defendants were found liable for 50% of the $2.6 million in alleged damages and assessed a punitive damages award of 50% of that amount, the total award would be $1.9 million.  After subtracting $608,000 for the cross-complaint, Harouche would receive $1.3 million.  To Harouche's counsel's thinking, $1.1 million was 'close enough' to make the compromise 'reasonable,' especially given that victory is never guaranteed and, in the absence of a settlement agreement, Harouche risked receiving nothing due to the bankruptcies."

On April 15, 2021, in a minute order, the trial denied Sisca's motion for the $608,000 offset.  The trial court observed that Sisca sought the entire amount alleged in FCI's cross-complaint without addressing whether the cross-complaint was meritorious.  The trial court explained that "defendants do not address arguments regarding the cross-complaint's lack of merit or present evidence to allow the court to calculate a true value for the cross-complaint.  Thus, Sisca fails to meet the burden under *Conrad*[*v. Ball Corp.* (1994) 24 Cal.App.4th 439, 444].  [¶]

Because there is no basis for the court to decide the value of the cross-complaint, the court cannot apply an offset for the value of the release."

Sisca appealed.

## DISCUSSION

Sisca argues the court erred by denying the motion to offset the damages by $608,000.

### 1.    *Standard of Review and Applicable Law*

"We generally review a ruling granting or denying a section 877 settlement credit under the deferential abuse of discretion standard.  [Citation.]  To the extent that we must decide whether the trial court's ruling was consistent with statutory requirements, we apply the independent standard of review." (*Wade v. Schrader* (2008) 168 Cal.App.4th 1039, 1044.)  "The trial court's determination of the value of the consideration paid will be upheld on appeal if supported by substantial evidence." (*Franklin Mint Co. v. Superior Court* (2005) 130 Cal.App.4th 1550, 1558 (*Franklin Mint*).)

"Section 877 specifies circumstances under which an award of economic damages against a defendant may be offset by a codefendant's settlement. . . .  Section 877 promotes the recovery of damages, the settlement of litigation, and the equitable apportionment of liability among tortfeasors, while limiting the double recovery of damages."  (*LAOSD Asbestos Cases* (2018) 28 Cal.App.5th 862, 877-878.)  Section 877 provides:  "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights . . . it shall reduce

7

the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater." (§ 877, subd. (a).)

"Under subdivision (a) of section 877, the amount of the setoff is, in the absence of a stipulation, 'the amount of the consideration paid for [the release or dismissal].' But the amount of consideration paid within the meaning of section 877, subdivision (a) is not necessarily the amount of money paid. Often 'the amount of the offset is clouded by injection of noncash consideration into the settlement.' " (*Franklin Mint, supra,* 130 Cal.App.4th at p. 1557, fn. omitted.)

In determining the amount of an offset, the trial court engages in an equitable undertaking (*Abbot Ford, Inc. v. Superior Court* (1989) 43 Cal.3d 858, 873-874 *(Abbott Ford)*), taking into account the goals of good faith settlements, i.e. "the equitable sharing of costs among the parties at fault and the encouragement of settlements . . . as well as another important public policy: ' "the maximization of recovery to the plaintiff for the amount of . . . injury to the extent that negligence or fault of others has contributed to it." [Citation.] Thus, while the nonsettling defendant is entitled to a fair setoff, the injured plaintiff also has a right that the setoff not be excessive.' " (*Franklin Mint, supra,* 130 Cal.App.4th at pp. 1556–1557.)

Although there is some authority that the party seeking the offset has the burden of proof (see *Conrad v. Ball Corp., supra,* 24 Cal.App.4th at p. 444), it may be more accurate to say that the parties jointly share the burden. "[T]he court should not be burdened with the obligation to determine the actual value of such an agreement. . . . Rather, the parties to such an agreement, since

8

they are in the best position to place a monetary figure on its value, should have the burden of establishing the monetary value." (*Franklin Mint*, *supra,* 130 Cal.App.4th at p. 1557; citing *Abbott Ford, supra,* 43 Cal.3d at p. 879.*)*

"Thus, in moving under section 877.6 for a good faith settlement determination, the moving party must set forth the value of the consideration paid and an evidentiary basis for that valuation, and must demonstrate that the valuation 'was reached in a sufficiently adversarial manner to justify the presumption that a reasonable valuation was reached.' [Citations omitted]. . . . A nonsettling defendant may then challenge the settlement by 'attempt[ing] to prove that the parties' assigned value is too low and that a greater reduction in plaintiff's claims against the remaining defendants is actually warranted.' (*Abbott Ford, supra,* 43 Cal.3d at p. 879, 239 Cal.Rptr. 626, 741 P.2d 124.)." (*Franklin Mint*, *supra,* 130 Cal.App.4th at p. 1558.)[5]

## 2. *The Trial Court Did Not Abuse Its Discretion Denying the $608,000 Offset*

Sisca sought an offset equal to all the damages alleged in FCI's cross-complaint: (1) $446,000 due under payment application #57, (2) a "general liability insurance deduction" of $80,000, and (3) a "remaining balance to bill of $82,000.00." In its moving papers, to prove the offset, Sisca relied on: the allegations in FCI's cross-complaint; the settlement agreement; a document that defense counsel stated was payment application

---

[5] Following our remand to the trial court, it was Sisca who moved to determine the offset. Thus, the parties were in the opposite procedural position than the parties in *Franklin Mint, supra,* 130 Cal.App.4th at pp. 1554-1555.

9

#57; and Harouche's and Harouche's employee's testimony that Harouche did not pay payment application #57.

The evidence established that FCI previously sought $608,000 from Harouche, and Harouche had not paid the final payment application of $446,000. However, the evidence did not show Harouche actually owed any amount to FCI or that the cross-complaint for $608,000 had merit and, therefore, its dismissal was consideration paid to Harouche.

Sisca provided no evidence showing whether payment application #57 or the bill for a remaining balance of $82,000 identified work that was part of the original contract or a change order. The evidence did not show that Harouche had approved the work (either under the original contract or via change order) identified in payment application #57 or the outstanding $82,000 bill. Sisca's evidence itself called into question the charges listed in the payment application. In the deposition testimony attached to the motion, Harouche testified he did not pay payment application #57, and that "A lot of [payment application #57] was bogus because everything was thrown into a pot, like I'll charge you for everything, like, including a chair that was missing."

Sisca did not submit declarations, testimony, or documentation showing the work accounted for in payment application #57 was completed by FCI. Although Harouche received a certificate of occupancy (which indicates the job was substantially completed), the certificate does not address the approval and completion of items in pay application #57 or the other remaining balance. Sisca produced no evidence that countered Harouche's testimony that he was not liable for the $80,000 "general liability insurance deduction" or the $82,000.00 balance.

Sisca asserts that Harouche is "bound by his judicial admission valuing the non-cash component of the settlement at $608,000." The statement that Sisca relies on is found in Harouche's opposition to Sisca's motion contesting the good faith settlement determination:

> "[The settlement amount] took a long time to resolve. The discussions went well into the night. Finton and his counsel argued vehemently for a low settlement amount. Harouche's counsel argued vehemently for a high settlement amount. With respect to the fraud, Harouche's counsel argued that Harouche was entitled to: (a) the $235,000 kickback to TWC; (b) the difference in cost between the actual change orders and the forged change orders, which was many hundreds of thousands of dollars; (c) the undisclosed payment to TWC of 4% of the Contract Sum paid by Harouche ($546,697.24); (d) interest on these sums from the date Harouche made the payments ($300,000-$500,000); and (e) punitive damages. Harouche's counsel also argued that the Finton Defendants were responsible for attorney's fees, unpaid insurance premiums which were FCI's responsibility under the Construction Contract, and the insurance deductible paid by Harouche for the construction defect claim. [Citation.]

> "Finton and his counsel fought these arguments vociferously. Finton express [sic] deep concern that a large settlement would cripple his ability to conduct business after the bankruptcy, especially given the non-dischargeable judgment.

*Finton's counsel also argued repeatedly that the settlement should be lessened because of FCI's $608,000 cross-complaint.* The discussions became so heated that, at one point, Harouche's counsel ended the discussions and left the conference room. After ten minutes or so, Finton's counsel tracked him down and convinced him to continue the conversation. [Citation.]

"At the end of the meeting, Harouche agreed to accept $1.1 million because: (a) there is always some chance of not prevailing, (b) even assuming he did prevail, there was a wide range of potential damages, (c) there was a significant risk of obtaining only a dischargeable judgment, and (d) there was a very large possibility of being unable to collect even if the judgment was non-dischargeable because the Finton Defendants are currently insolvent, and there is no guarantee they will ever be solvent again. [Citation.]

"In addition, as noted above, FCI had a cross-complaint against Harouche for $608,000. So, for example, if the Finton Defendants were found liable for 50% of the $2.6 million in alleged damages and assessed a punitive damages award of 50% of that amount, the total award would be $1.9 million. After subtracting $608,000 for the cross-complaint, Harouche would receive $1.3 million. To Harouche's counsel's thinking, $1.1 million was 'close enough' to make the compromise 'reasonable,' especially given that victory is never guaranteed and, in the absence

of a settlement agreement, Harouche risked receiving nothing due to the bankruptcies." (Italics added.)

In considering the "admission" quoted above in italics, the trial court implicitly found that Harouche only acknowledged his overall recovery could possibly be reduced by FCI's $608,000 cross-complaint, not that he agreed the $608,000 was lawfully owed. Harouche made this statement when analyzing the reasonableness of the $1,100,000 settlement. Although the trial court could have reasonably concluded that Harouche attributed some value to the possibility of the cross-complaint's success (using the "for example" language), the trial court was not obligated to find Harouche had admitted the cross-complaint was worth face value.

The quoted language also showed that it was Harouche's position that FCI was the one responsible for the insurance deductible paid by Harouche for a construction defect claim.

Harouche's statement in his opposition to Sisca's motion contesting the good faith settlement determination did not, as a matter of law, diminish Harouche's evidence that the cross-complaint was worthless. The trial court reasonably found that Harouche credibly showed the value of the claim was worth less than $608,000, if it had any value at all. Given the gaps in Sisca's evidence, the trial court "may not [have been] able to more than make its best estimate." (*Franklin Mint, supra*, 130 Cal.App.4th at p. 1561.) Considering the significant latitude the trial court had in the offset valuation, we will not second guess the court's finding that the value of the cross-complaint was at most negligible and that no offset needed to be awarded.

13

### *DISPOSITION*

The judgment is affirmed.  Plaintiff Michel Harouche is awarded costs on appeal.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

MOOR, J.

14